# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-1961V

| | |
|---|---|
| JULIE SHIVER, | Chief Special Master Corcoran |
| Petitioner, | Filed: September 16, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Parisa Tabassian, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On October 4, 2021, Julie Shiver filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 5, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to compensation, and award damages in the amount of **$190,000.00 for actual pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Over a year after the case was activated, Respondent determined that he was amenable to informal resolution, and the parties entered into negotiations (ECF No. 27). Soon thereafter, however, Petitioner reported that she had not received a response to her demand and intended to file a motion for a ruling on the record based on her view that the evidence supported a conceded claim (ECF No. 29).

After reviewing the evidence, I issued an order setting forth my preliminary view that there appeared to be preponderant evidence supporting the conclusion that the vaccine in question was administered in Petitioner's left shoulder. Scheduling Order, issued June 14, 2023 (ECF No. 30). I therefore advised the parties to negotiate, but added that Petitioner could file a motion for a ruling on the record if the parties had not reached an agreement by the end of July 2023. *Id.*

The parties briefly negotiated, but soon reported an impasse (ECF Nos. 31, 32). Petitioner then filed a motion for a ruling on the record seeking a ruling that she is entitled to damages, and addressing the quantum of damages (ECF No. 34). Respondent opposed, Petitioner replied, and later filed a supplemental reply based on updated medical records (ECF Nos. 36-39).

On May 19, 2024, Petitioner reported that she had undergone a second shoulder surgery and additional treatment, and planned to update her position on damages (ECF No. 41). On August 25, 2024, Petitioner filed a second supplemental reply, followed by additional medical records (ECF Nos. 43, 44). On August 28, 2024, Respondent filed a status report stating that he had reviewed Petitioner's supplemental briefs and "maintains his position as articulated in his Combined Rule 4 and Response to Petitioner's Motion . . . and otherwise defers to the Court" (ECF No. 45). The matters of whether Petitioner is entitled to compensation and, if so, how much, are now ripe for consideration.

## II.    Factual Evidence

Although I have reviewed the entire record, this decision summarizes only evidence relevant to the situs of vaccine administration, the onset of Petitioner's shoulder pain, Petitioner's entitlement to damages, and the amount of damages.

### A.  Medical Records

On October 5, 2020, Petitioner received a flu vaccine at her workplace. Exs. 1 at 4; 17 at 3. The vaccination record does not indicate the administration situs.

Two weeks later (October 20, 2020), Petitioner was seen at the Mizell Medical clinic complaining of pain and swelling in her left arm at the (purported) vaccine injection site. Ex. 3 at 15. She also complained of restless legs, fatigue, depression, and sleep disturbance. *Id.* In the examination section, the provider circled that she was actively using all extremities, with no other note. *Id.* Petitioner was given Toradol and steroid injections in her gluteal muscle; while the record is not clear as to which condition the

injections were intended to treat, it seems likely that the steroid injection would have been injected in her shoulder area if it was intended to treat her shoulder condition.[3] *Id.* at 15-16. It does not appear she was otherwise treated for her left arm pain. *Id.*

Over six weeks later, on December 5, 2020, Petitioner had an x-ray due to a twisted ankle occurring the previous day. Ex. 4 at 10. She was seen by a certified registered nurse practitioner ("CRNP") at Mizell Memorial Hospital on December 9, 2020, for her ankle injury. Ex. 3 at 25. Neither record mentions any concerns relating to her left arm or shoulder.

On December 14, 2020, Petitioner notified her employer of her left shoulder injury from her October vaccination, and she submitted a worker's compensation claim the following day. Ex. 13 at 48-49. She reported an accident date of October 5, 2020, explaining that she received a flu vaccine in her left arm on that date and had pain and weakness afterward. *Id.* She went to her primary care provider ("PCP") two weeks later and was told that it was normal to have pain and weakness after vaccination, but the problems had persisted. *Id.*

On December 19, 2020, Petitioner saw CRNP Robin Fischer at the Andulasia Walk-in Clinic for left shoulder pain and weakness. Ex. 4 at 8. Petitioner explained that she was having shoulder pain and weakness from a vaccine received on October 5th. *Id.* On examination, her left shoulder range of motion ("ROM") was decreased due to pain, with tenderness along the left deltoid. *Id.* at 9. She was assessed with a left frozen shoulder and vaccine reaction. *Id.* CRNP Fischer noted that Petitioner had not been moving her shoulder due to pain, and now had decreased ROM and would need physical therapy ("PT"). *Id.*

Petitioner again delayed her shoulder pain treatment – this time for nearly two months. Thus, she saw CRNP Sherry Wright on January 4 and January 18, 2021, for her December left ankle sprain.[4] Ex. 3 at 53; Ex. 5 at 19-22. But these records do not mention left arm or shoulder pain.

---

[3] The record is a form filled in by hand. Ex. 3 at 15-16. The Toradol and steroid injections are listed under the third numbered item under "Assessment/Plan," which appears to be for a condition starting with an "R," possibly restless leg syndrome, although it is handwritten and difficult to read. *Id.* at 16. However, Petitioner later suggested to another health care provider that the injections were for her shoulder (but were ineffective). Ex. 5 at 16 (April 7, 2021 orthopedist visit where Petitioner complained of left shoulder pain since her October flu vaccination and told provider that she went to her PCP and "received toradol IM and steroid inj IM on 10-20-2020 and pain did not improve"). Petitioner's declaration also suggests that the steroid injection was for her shoulder. Ex. 2 at ¶ 11 (stating that she saw her PCP on October 20, 2020 and "received a steroid injection in my hip that helped to alleviate the edge of the pain but did not take it completely away. This only lasted for a few days." My ruling on onset herein is not affected by whether the October 2020 injections were treatments for Petitioner's shoulder pain or some other condition.

[4] Respondent noted the January 18th visit as a December 4, 2020 consultation (Resp. at *3). However, the record Respondent cites (Ex. 3 at 53) is for a January 18, 2021 consult pertaining to an injury that occurred on December 4, 2020.

Petitioner underwent a PT evaluation for her left shoulder on February 17, 2021. Ex. 7 at 16. She reported that she had received a flu vaccine on October 5, 2020, and "a couple of days after" she started to have upper arm pain. *Id.* On a medical history form, she listed her date of injury as "10/5/2020 – flu vaccine." *Id.* at 12. For the last several months, she continued to have pain and weakness with loss of ROM. *Id.* at 16. She reported a current pain level of three out of ten, with her pain ranging to eight out of ten at worst. *Id.* On examination, her left shoulder active ROM was 138 degrees in flexion (compared to 180 degrees on the right side), 145 degrees in abduction (compared to 180 degrees on the right), and 56 degrees in external rotation (compared to 90 degrees on the right).[5] *Id.* at 17. She also had slight weakness in her left shoulder compared to her right. *Id.* The therapist thought Petitioner would benefit from an MRI, noting that she had loss of active and passive ROM in her left shoulder with pain and limitations in activities of daily living and job duties. *Id.* at 18.

Petitioner returned to CRNP Fischer at the Andulasia Walk-in Clinic for left arm pain over a month later, on March 27, 2021. Ex. 4 at 6. CRNP Fischer noted that on initial examination Petitioner had been unable to complete full ROM with her left shoulder and had been sent to PT. *Id.* Petitioner had completed ten PT sessions and was still having shoulder pain as well as weakness. *Id.* An MRI was recommended. *Id.*

Petitioner completed a total of 12 PT sessions between February 17 and March 31, 2021. Ex. 7 at 16-57. She was re-evaluated and discharged on March 31st. *Id.* at 54. Her pain levels had improved somewhat, and were two out of ten at best and five out of ten at worst. *Id.* Her passive ROM had improved, while her active ROM had improved in some planes and worsened in another.[6] *Id.* at 55.

Petitioner returned to NP Wright of Andulasia Orthopedics on April 7, 2021. Ex. 5 at 16. She complained of left shoulder pain and limited ROM since her October 2020 vaccination. *Id.* She noted that she had received a Toradol and steroid injection (in her gluteal muscle) on October 20, 2020, but without full or persistent improvement. *Id.* With PT, her pain had improved slightly, but her weakness had not improved. *Id.* Her pain was a "deep ache and constant" and worsened with ROM. *Id.* She rated her pain as two out of five. *Id.* On examination, she had limited, painful ROM with positive impingement signs and decreased strength. *Id.* Petitioner received a steroid injection in her left shoulder and was advised to continue PT to strengthen her rotator cuff. *Id.* at 17.

---

[5] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84 (F. A. Davis Co., 5th ed. 2016).

[6] Her left shoulder passive ROM was now 170 degrees in flexion and abduction and 80 degrees in external rotation. Ex. 7 at 55. Her active ROM was now 140 degrees in flexion (compared to 138 at the start of PT), 138 degrees in abduction (worse than the 145 degrees at the start of PT), and 75 degrees in external rotation (an improvement from 56 degrees at the start of PT).

Petitioner underwent another PT evaluation on April 26, 2021. Ex. 7 at 65. She reported "left shoulder pain since October 2020 w/onset of pain after getting flu shot." *Id*. A steroid injection had provided some pain relief, but she continued to have weakness and was unable to lift more than five pounds. *Id*. Her pain level was currently three out of ten, and ranged from one to four out of ten. *Id*. She was noted to have mild active ROM deficits with limited end range due to pain, as well as muscle weakness and positive impingement tests with pain. *Id*. at 67. Petitioner completed a total of ten PT sessions between April 26 and May 26, 2021. Ex. 7 at 65-99.

Petitioner followed up with CRNP Wright on April 28, 2021, reporting that her shoulder pain had improved 25% since her steroid injection three weeks earlier. Ex. 5 at 14. Due to failed outpatient treatment and worsening symptoms, Petitioner was referred for an MRI arthrogram. *Id*. at 15.

Petitioner underwent an MRI arthrogram on May 25, 2021. Ex. 6 at 4. The MRI showed that her rotator cuff was intact, with no indication of a partial or full thickness tear. *Id*. There was a small amount of fluid in the subacromial bursa consistent with bursitis, and mild osteoarthritic changes with hypertrophy. *Id*. Mild impingement could not be ruled out. *Id*. at 5.

Petitioner returned to CRNP Wright to review the MRI results on June 2, 2021. Ex. 5 at 12. She rated her pain as slightly improved, at one and a half out of five. *Id*. CRNP Wright reviewed treatment options with Petitioner, and Petitioner opted to proceed with a left diagnostic arthroscopic surgery with possible subacromial decompression and rotator cuff repair. *Id*. at 12-13.

On August 5, 2021, orthopedist Dr. Patrick Kelly performed left shoulder arthroscopy, converted into an open subacromial decompression procedure with bursectomy and lysis of adhesions. Ex. 5 at 29-30. Her post-operative diagnoses were impingement syndrome, reactive bursitis, and adhesive capsulitis. *Id*.

At a post-operative appointment with Dr. Kelly on August 18, 2021, Petitioner reported pain that was achy and dull, and worse at night. Ex. 5 at 9. She was taking Norco with mild relief, and rated her pain as one out of ten. *Id*. On examination she displayed limited, painful ROM. *Id*. at 10. She was referred to PT. *Id*.

Petitioner underwent a post-operative PT evaluation on August 26, 2021. Ex. 12 at 14. Her pain was "much improved" since her surgery, although she had residual soreness from the surgery itself, and reported trouble sleeping due to pain and discomfort. *Id*. Her pain levels ranged from one out of ten at best, to seven out of ten at worst. *Id*. On examination, her left shoulder active ROM was 98 degrees in flexion, 88 degrees in abduction, and 76 degrees in external rotation. *Id*. at 15. Her left shoulder passive ROM was 120 degrees in flexion, 100 degrees in abduction, and 82 degrees in external rotation. *Id*.

At a post-operative visit with Dr. Kelly on September 15, 2021, Petitioner reported that she was doing PT three times a week, and a home exercise program daily. Ex. 5 at 7. Her ROM was improving, and her pain was two out of five. *Id.* Pain interfered with her sleep. *Id.* By mid-September 2021, Petitioner's left shoulder active ROM had improved to 155 degrees in flexion, 157 degrees in abduction, and 82 degrees in external rotation. Ex. 12 at 41. A few weeks later (October 7, 2021), her ROM remained the same, but her pain levels worsened slightly, now ranging from two to eight out of ten. Ex. 20 at 52. By the end of October 2021, however, her pain levels improved significantly, now ranging from zero to two out of ten. *Id.* at 73. Her active ROM had further improved as well, to 170 degrees in flexion and 165 degrees in abduction. *Id.* at 73-74.

On October 27, 2021, Petitioner saw Dr. Kelly for a follow up visit. Ex. 15 at 7. She had improved ROM, but external rotation remained painful and limited, and she had pain in her shoulder joint with popping. *Id.* The record noted full ROM in her left shoulder, but atrophy of her deltoid. *Id.* at 8. Orders for a TENS[7] unit for home use and more PT were provided. *Id.* Petitioner saw Dr. Kelly again the next month (November 24, 2021). *Id.* at 10. She had completed PT and had improved ROM, although external rotation remained painful. *Id.* She had received an "ESTIM" unit the day before. *Id.* On examination, her left shoulder incision was healed. *Id.* at 11. Her strength was improved, as was her ROM. *Id.* Petitioner was advised to start using the TENS unit and continue home exercises. *Id.* She could return to work without restrictions. *Id.* If her pain continued, Dr. Kelly planned to order another MRI. *Id.*

Petitioner appears to have attended approximately 30 PT sessions between August 26 and November 24, 2021.[8] Ex. 12 at 14-47; Ex. 13 at 654-754; Ex. 20 at 5-101. At Petitioner's November 24, 2021 session, her ROM and strength were within normal limits, and she was discharged from PT. Ex. 20 at 101.

Petitioner saw Dr. Kelly again three months later, on February 23, 2022. Ex. 15 at 13. She had returned to full duty at work in November 2021, and was using a TENS unit occasionally. *Id.* She did home exercises two to three times daily. *Id.* She had intermittent soreness and tenderness, as well as numbness at the front of her shoulder. *Id.* Her ROM remained limited with lifting, and her arm still felt weak. *Id.* Her pain was intermittent and

---

[7] TENS is an abbreviation for transcutaneous electrical nerve stimulation, which involves electrical stimulation of nerves that interferes with transmission of pain signals. *TENS* and *transcutaneous electrical nerve stimulation*, DORLAND'S ONLINE, https://www.dorlandsonline.com/dorland/definition?id=108464 (last visited Sept. 16, 2024).

[8] Respondent suggests that there were 34 PT sessions during this period. Resp. at *6. However, the PT records state that there were 30 visits. Ex. 20 at 100. The PT records are somewhat confusing, in some cases containing dates for which there are no treatment records. In any event, a difference of four PT sessions would not change my views on damages.

had improved. *Id.* Dr. Kelly recommended that she continue with home exercises for three months and return to normal activities. *Id.* at 14.

Petitioner underwent a PT impairment evaluation in connection with her worker's compensation claim on April 25, 2022. Ex. 16 at 6. The record notes an injury date of October 5, 2020,[9] explaining that Petitioner was given a vaccine and "within 24 hours reported excruciating pain in her left shoulder as well as weakness and decreased ROM." *Id.* Her present pain level was between one and two out of ten, and she continued to have decreased strength and function. *Id.* She had been back to full work duties for five months. *Id.* After evaluating her left shoulder ROM, she was found to have a four percent upper extremity impairment, which yielded a two percent whole person impairment. *Id.* at 7.

There is a subsequent treatment gap of nearly nine months (and it occurred during the pendency of this matter). On January 19, 2023, Petitioner was seen at Mizell Medical Clinic for a prescription refill, in addition to problems with her shoulder and toe. Ex. 18 at 31. She was given a PT referral. *Id.* at 33.

Petitioner underwent another PT evaluation for her left shoulder on January 30, 2023. Ex. 20 at 112. She reported a pain level of one out of ten, ranging to three out of ten at worst. *Id.* On examination, her left shoulder active ROM was mildly reduced compared to her right shoulder, with somewhat reduced strength. *Id.* at 113. Petitioner attended four PT sessions between January 30 and February 16, 2023, when she was discharged and instructed to continue with exercises at home. Ex. 20 at 112-121.

Petitioner returned to Mizell Medical Clinic over five months later, on August 4, 2023. Ex. 21 at 6. She requested a medication refill and wanted to discuss bilateral arm pain. *Id.* She explained that she continued to have left shoulder pain and that it felt like the bone got "stuck" and she had to move the whole arm to get it unstuck, after which she would have "complete numbness" down the arm. *Id.* at 9. On examination, her left shoulder had limited ROM and was tender to palpation. *Id.* She also had tenderness in her right arm. *Id.* She was assessed with impingement syndrome of the left shoulder and referred to an orthopedist. *Id.*

Petitioner saw orthopedist Dr. Roger Ostrander for left shoulder pain on August 21, 2023. Ex. 22 at 25. She now rated her pain as two out of ten. *Id.* at 26. Her pain had been present for three years and was aggravated by lifting, carrying, pushing, and pulling. *Id.* X-rays revealed osteoarthritis of the left acromioclavicular joint. *Id.* at 27. She was assessed with osteoarthritis, tendinitis of the left rotator cuff, left thoracic outlet syndrome, and pain of the left shoulder joint. *Id.* An MRI was ordered. *Id.*

Petitioner underwent a left shoulder MRI on September 25, 2023. Ex. 23 at 29. The MRI showed rotator cuff tendinosis without a tear, moderate acromioclavicular joint

---

[9] Another part of the record incorrectly states that she received the flu vaccination on October 2, 2020. Ex. 16 at 6.

arthrosis with hypertrophy, slight glenohumeral joint effusion, and moderately increased biceps long head tendon sheath fluid. *Id.* On the same day, Petitioner returned to Dr. Ostrander to review the MRI. Ex. 22 at 20. Dr. Ostrander administered an ultrasound guided steroid injection, and referred her to Dr. Adam Mullan to evaluate her cervical spine. *Id.* at 22.

Petitioner returned to Dr. Ostrander the following month (October 23, 2023), reporting that her left shoulder pain had improved after the steroid injection. Ex. 22 at 16, 18. On examination, her left shoulder active and passive forward flexion were both 160 degrees. *Id.* at 18. Her external rotation and internal rotation in abduction were 90 degrees and 70 degrees, respectively. *Id.*

Petitioner was seen at Mizell Medical Clinic on December 1, 2023 for sinus problems. Ex. 21 at 11. The record noted that Dr. Ostrander was concerned that Petitioner may have left Parsonage-Turner syndrome. *Id.*

Petitioner saw Dr. Mullan for neck pain on December 13, 2023. Ex. 21 at 18. She reported left shoulder pain radiating into her left upper arm. *Id.* At best the pain was one out of ten; at worst, it was between seven and eight out of ten. *Id.* Her symptoms originally began in October 2020 after a flu vaccination in her left deltoid. *Id.* She was assessed with left shoulder pain and cervical spondylosis. *Id.* at 20. An EMG/nerve conduction study was normal. *Id.* at 22. Dr. Mullan thought that her left arm pain was not likely to be a result of cervical radiculopathy or peripheral nerve entrapment. *Id.* at 20-21. He saw no evidence of a brachial plexopathy for underlying Parsonage-Turner syndrome. *Id.* He noted that the timeline of her pain was not typical for Parsonage-Turner, given that her pain began one day after vaccination rather than three to seven days after. *Id.* He recommended that she return to Dr. Ostrander for further treatment. *Id.*

Petitioner returned to Dr. Ostrander on February 7, 2024, complaining of continued left shoulder pain and weakness. Ex. 22 at 10, 12. She also reported anxiety related to her injury, stating that as a nurse she now had a hard time giving others intramuscular injections. *Id.* Dr. Ostrander discussed operative and nonoperative treatment options, and Petitioner opted for surgery. *Id.*

Petitioner underwent a second shoulder surgery on May 16, 2024. Ex. 25 at 1-2. Dr. Ostrander performed a left shoulder arthroscopy with extensive debridement, subacromial decompression, distal clavicle excision, and removal of foreign material (a loose suture from her previous surgery). *Id.* Dr. Ostrander found degenerative fraying of the labrum and a ten percent partial thickness tear of the supraspinatus. *Id.* Additionally, Petitioner had osteoarthritis and extensive bursitis and scarring. *Id.*

Petitioner underwent a post-operative PT evaluation on May 20, 2024. Ex. 24 at 20. She reported a long history of left shoulder pain beginning in October 2020 after a vaccination. *Id.* After her first surgery, she had functional ROM but continued to have pain with ROM and weakness. *Id.* At the May 20th evaluation, her pain level ranged from three

to four out of ten. *Id.* Her left shoulder passive ROM was 100 degrees in flexion, 120 degrees in abduction, and 50 degrees in external rotation. *Id.* at 21.

By mid-June 2024, Petitioner's active ROM had improved. Ex. 24 at 51. And by early August 2024, she was no longer reporting any pain and had met her ROM treatment goals, but continued to have mild strength deficits. Ex. 27 at 15-18. At her discharge from PT on August 16, 2024, she was pain-free, with full ROM and strength. *Id.* at 25-27. Petitioner attended a total of 25 PT sessions between May 20 and August 16, 2024. Ex. 24 at 20-55; Ex. 27 at 4-28.

### B. Declaration

Petitioner submitted a declaration in support of her claim.[10] Ex. 2. Petitioner states that the October 5th flu vaccine was administered in her left shoulder. *Id.* at ¶¶ 2, 7. She experienced left upper arm and shoulder pain beginning within 24 to 48 hours after vaccination. *Id.* at ¶ 10. She went to her primary care provider two weeks later and received a steroid injection in her hip, which took the edge off her pain for a few days but did not eliminate it. *Id.* at ¶ 11.

She experienced weakness when raising her left arm above her head, rotating her palm upwards, and with a side/backwards motion. Ex. 2 at ¶ 12. Her pain worsened when using her left arm to bathe, drive, work at her desk, and do schoolwork on her computer. *Id.* Her pain decreased when she relaxed her arm at her side. *Id.* The pain woke her at night, and putting on and taking off jackets led to increased pain and weakness. *Id.* at ¶ 13. The pain was "constant and unbearable." *Id.*

Petitioner filed a workers compensation claim on December 15, 2020, and was seen at the Andulasia Walk-in Clinic four days later. Ex. 2 at ¶ 14. Although PT was ordered in December, it was not approved by the workers compensation bureau until February 2021. *Id.* She then began PT three times a week. *Id.* at ¶ 15.

Her physical therapist advised her to return to the walk in clinic in March 2021 because she was not improving, instead having increased pain. Ex. 2 at ¶ 16. At that time, the pain had shifted into a "more intense deep ache," and she was unable to move her left arm in certain ways such as completely overhead, fully extended to the side, and up, and could not lift a bag of groceries above waist height. *Id.*

The walk-in clinic referred her to an orthopedist, who sent her back to PT for rotator cuff strengthening for left shoulder impingement and adhesive capsulitis. Ex. 2 at ¶ 17. During the May 2021 arthrogram, she was "in a severe amount of pain," and afterward she had "an enormous amount of pain and decreased range of motion in [her] left arm for

---

[10] Although Petitioner labeled this document an affidavit, it is not notarized. Nonetheless, it is acceptable as a declaration pursuant to 28 U.S.C. § 1746 because it is declared true and correct under penalty of perjury.

a few days." *Id.* at ¶ 18. Dr. Kelly recommended surgery based on the MRI results, and she underwent shoulder surgery in August 2021. *Id.* at ¶¶ 19, 20.

Following surgery, Petitioner had pain and insomnia. Ex. 2 at ¶ 20. As of late September 2021 (when she signed her declaration), her ROM had improved slightly, her pain levels varied, and her shoulder weakness persisted. *Id.* Dr. Kelly prescribed Ultram and Ambien for pain, weakness, stiffness, and sleep problems from before and after surgery. *Id.* at ¶ 21.

Petitioner's shoulder injury changed her daily life due to the pain, weakness, and activities it prevented her from doing. Ex. 2 at ¶ 24. She had difficulties with reaching out and overhead, rotating her arm, moving her arm to the side, typing on a computer, washing her hair, drying off with a towel, putting groceries in a cart and her car, lifting heavy items, holding her phone to her ear, and driving. *Id.* at ¶ 25. Even longer walks can cause her arm to feel heavy and increase her weakness. *Id.* at ¶ 26. Daily activities such as vacuuming and laundry cause increased pain. *Id.* at ¶ 27. She needs to take breaks from work because she cannot type for long, or needs to keep her keyboard close, as fully extending her arm is uncomfortable. *Id.*

### III.     Factual Findings and Ruling on Entitlement

#### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V,

1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[11]   a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . .  does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity

---

[11] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C. F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of

the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Situs of Vaccine Administration, Onset, and Entitlement

Petitioner argues that the record supports a finding that her SIRVA symptoms began within 48 hours of vaccination. Petitioner's Motion for a Ruling on the Record and Brief in Support of Damages, filed July 3, 2023, at *17 (ECF No. 34) ("Mot."). Petitioner cites her affidavit testimony, as well as her December 19, 2020 walk-in clinic visit, April 2021 orthopedic visits, and April 2021 and April 2022 PT evaluations. Mot. at *17-18.

Respondent objects to finding in Petitioner's favor on two grounds. Respondent's Combined Rule 4 and Response to Petitioner's Motion, filed Aug. 28, 2023, at *9-11 (ECF No. 36) ("Resp."). First, Respondent asserts that there is no objective, contemporaneous evidence of the injection situs of Petitioner's flu vaccine. Resp. at *9. Although Petitioner alleges that the vaccine was administered in her left shoulder, the administration record is silent on the situs issue. While Petitioner's worker's compensation claim proceeded under the assumption that the vaccine had in fact been administered in her left arm, this fact determination does not bind me. *Id.*

Second, Respondent argues that Petitioner has not demonstrated by preponderant evidence that her left shoulder pain began within 48 hours of vaccination due to her "delayed presentation and vague onset references." Resp. at *10. She did not report shoulder pain to a medical provider until two weeks after vaccination, at which time she reported pain and swelling around the injection site, but treatment appeared to have focused on other matters, suggesting (in Respondent's view) that her left arm was not a primary or pressing concern. *Id.* It is also unclear whether the Toradol and steroid injections administered in Petitioner's gluteal muscle during this appointment were related to her shoulder injury. *Id.* Further, she did not report the injury to her employer until over two months after vaccination, and was not diagnosed with a left shoulder pathology until December 19, 2020. *Id.* at *10-11. Then, she did not pursue treatment for another two months, when she began PT and reported that her shoulder pain began "a couple of days" after vaccination. *Id.* at *11. In Respondent's view, Petitioner's declaration, prepared a year after vaccination for purposes of litigation, merits little evidentiary weight. *Id.*

Petitioner replies that although the vaccination record does not document the injection situs, in such cases the special master may look to other medical records and testimony. Petitioner's Reply, filed Sept. 6, 2023, at *2 (ECF No. 37) ("Reply"). Petitioner asserts that her testimonial statements and subsequent medical records - including an appointment just two weeks after vaccination – provide preponderant proof that her flu vaccine was administered in her left shoulder. Reply at *2-4. At subsequent medical visits, she consistently reported that her injury was to her left arm and started after vaccination. *Id.* at *3. And there is no other reason why she would have left shoulder pain starting

within 48 hours after vaccination. *Id.* Petitioner cites *Irwin v. Sec'y of Health & Human Servs.*, No. 19-956V, 2021 WL 5504701 (Fed. Cl. Spec. Mstr. Oct. 18, 2021), *Baker v. Sec'y of Health & Human Servs.*, No. 19-1771V, 2020 WL 6580192 (Fed. Cl. Spec. Mstr. Oct. 9, 2020), and *Boyd v. Sec'y of Health & Human Servs.*, No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021).

Petitioner argues that medical records and testimonial evidence preponderantly show that the onset of her shoulder pain occurred within 48 hours after vaccination, and there are no medical records to the contrary. Reply at *5-10 (citing *Wyffels v. Sec'y of Health & Human Servs.*, No. 18-1874V, 2021 WL798834 (Fed. Cl. Spec. Mstr. Jan. 26, 2021); *Klausen v. Sec'y of Health & Human Servs.*, No. 19-1977V, 2021 WL 2808989 (Fed. Cl. Spec. Mstr. June 2, 2021); *Porcello v. Sec'y of Health & Human Servs.*, No. 17-1255V, 2020 WL 4725507 (Fed. Cl. Spec. Mstr. June 22, 2020); *Boyd*, 2021 WL 4165160). She first reported her injury to a medical provider just two weeks after vaccination. *Id.* at *8. While there may have been intervening care for other concerns in early December that did not mention her shoulder injury, shortly thereafter she filed a worker's compensation claim and sought treatment for her shoulder pain. *Id.*

### C. Factual Findings

#### 1. Situs of Vaccine Administration

I find that a preponderance of the evidence supports a finding that the flu vaccine was administered in Petitioner's left arm, as she asserts. Although the vaccine administration record is silent on the situs, Petitioner first presented to a medical provider complaining of left arm pain at the flu vaccine injection site just two weeks after vaccination. Ex. 3 at 15. Then, when she reported her injury to her employer, she reported that she "received a flu shot on 10/05/2020 in her left arm" and experienced pain and weakness thereafter. Ex. 13 at 49. At her December 19, 2020 appointment, she again complained of left shoulder pain from a flu vaccine received on October 5th. Ex. 4 at 8. And at her February 17, 2021 PT evaluation for left shoulder pain, she explained that her pain began after a flu vaccination. Ex. 7 at 16. Petitioner has also provided testimonial evidence that the October 2020 flu vaccine was administered in her left shoulder. Ex. 2 at ¶¶ 2, 7. Otherwise, there is no evidence supporting an alternate vaccination situs.

#### 2. Onset

The record evidence preponderantly establishes that Petitioner experienced shoulder pain within 48 hours of vaccination. She first reported to a health care provider complaining of left shoulder pain from vaccination two weeks after vaccination. Although it is unclear whether the injections received at this time were for her shoulder pain or other concerns, the record documents that she related her left arm pain to her flu vaccination. Ex. 3 at 15. Petitioner then did not seek additional care until two months later. When she filed her worker's compensation claim, she explained that the delay was due to her PCP telling her that her pain and weakness were normal. Ex. 13 at 49. And when she sought

care thereafter, she consistently related her left shoulder pain to the October flu vaccination. Ex. 4 at 8; Ex. 7 at 16. At her initial PT evaluation, she stated that her pain began "a couple of days after" her vaccination. Ex. 7 at 16.

Although Petitioner underwent an ankle x-ray and was seen for an ankle injury in early December without mentioning her shoulder pain, I do not find that this casts doubt on whether her shoulder pain began within 48 hours of vaccination. These visits appear to be related to an acute injury, and were limited to care for that injury. Ex. 3 at 25. Petitioner again sought care for her shoulder promptly thereafter, further weakening any suggestion that she was not experiencing shoulder pain at the time.

I also note that delays in treatment do not prevent a finding of Table onset. It is common for SIRVA petitioners to delay seeking care, in hopes that their condition will resolve on its own. *See Amor v. Sec'y of Health & Human Servs*., No. 20-0978V, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024) ("[w]hile evidence of a medical visit for shoulder pain within two days of vaccination would be highly relevant to the question of onset, in my experience it is much more common for petitioners in SIRVA cases to delay seeking care for weeks, or even months, in hopes that the pain will resolve without treatment"); *Winkle v. Sec'y of Health & Human Servs*., No. 20-0485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021) ("[i]t is common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own" and finding onset was within 48 hours when the petitioner did not seek care until five months after vaccination).

Petitioner promptly reported her shoulder injury to a health care provider, then did not seek care for approximately two months. However, she has provided a reasonable explanation for this. And when her pain and weakness did not improve with time, she filed a worker's compensation claim and sought additional medical care. Throughout, she consistently reported pain close-in-time to vaccination.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining SIRVA QAI criteria are not contested, and I find that they are satisfied. There is no evidence that Petitioner had a pre-vaccination left shoulder condition, or another condition or abnormality, that would explain her symptoms after vaccination. Ex. 3. Her symptoms were limited to her left shoulder, where she received the flu vaccine. Ex. 3. In addition, the record establishes that Petitioner received a covered vaccine in the United States. Ex. 1 at 4. She experienced the residual effects of her condition for more than six months. Ex. 5 at 16; Ex. 7 at 65. And she states that she has not filed a civil action or collected an award or settlement of a civil action for damages for her vaccine-related injury, nor is she aware of anyone who has done so. Ex. 2 at ¶ 8.

### E. Entitlement

I find that Petitioner has established by a preponderance of the evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## IV.   Damages

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[12] *Hodges v. Sec'y of*

---

[12] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims,

*Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### B. Prior SIRVA Compensation Within SPU[13]

#### 1.  Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[14] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[15] As I have previously stated, the

---

were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[13] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[14] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[15] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than

written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[16]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[17] Agreement |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| **3rd Quartile** | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### 2.    Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

---

instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[16] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[17] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[18] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[19]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### C. Parties' Arguments

Initially, Petitioner sought a pain and suffering award between $140,000.00 and $160,000.00. Mot. at *2; 30-36. However, after undergoing a second surgical procedure in 2024, she increased her pain and suffering demand to $200,000.00. Petitioner's Second Supplemental Reply Brief, filed Aug. 25, 2024, at *1 (ECF No. 43) ("Second Supp. Reply"). Petitioner cites *M.W.*, *Pruitt*, *Meirndorf*, *Lang*, and *Whitehead*, with pain and

---

[18] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[19] *Joyce v. Sec'y of Health & Human Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

suffering awards ranging from $185,000.00 to $200,000.00, in support of her claimed award.[20] Second Supp. Reply at *7-13.

In support of this figure, Petitioner notes that she underwent two surgeries, three steroid injections, 62 PT sessions, two MRIs, an ultrasound, an x-ray, prescription tramadol, and did a home exercise program. Second Supp. Reply at *10. Petitioner views her treatment as most similar to the petitioners in *M.W.* and *Lang*, both involving pain and suffering awards of $195,000.00. *Id.* She asserts that her SIRVA has not yet fully resolved, and thus the duration is longer than the three years and ten months on record. *Id.* at *11.

Respondent argues that the record supports a pain and suffering award of no more than $100,000.00, citing decisions in *Hunt*, *Martin*, *Moore*, and *Hall*, all of which involved pain and suffering awards between $95,000.00 and $115,000.00. Resp. at *13, 18-20.[21] Respondent focuses on the duration of Petitioner's treatment and gaps in treatment. *Id.* at *15-16. Respondent did not update his damages position after Petitioner underwent additional treatment, and as such his briefing is based on Petitioner's condition lasting for 13 months and involving a single surgery, one cortisone injection, and just over 50 PT sessions. *Id.*

### D.  Appropriate Compensation for Pain and Suffering

Overall, Petitioner had a mild to moderate SIRVA that is notable more for its persistence than severity. She treated her injury for just under four years, including two surgical procedures, two[22] cortisone injections, five rounds of PT totaling approximately 81 sessions, and two MRIs. And the record reveals several lengthy gaps in treatment as well – some of which occurred while this case was pending. The gaps do not prevent a finding that the two surgeries Petitioner underwent were both associated with her SIRVA, but they undermine severity overall (while allowing for some possibility that other

---

[20] *M.W. v. Sec'y of Health & Human Servs.*, No. 18-267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021); *Pruitt v. Sec'y of Health & Human Servs.*, No. 17-757V, 2021 WL5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021); *Meirndorf v. Sec'y of Health & Human Servs.*, No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022); *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2022 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2022); and *Whitehead v. Sec'y of Health & Human Servs.*, No. 20-1118V, 2023 WL 6810959 (Fed. Cl. Spec. Mstr. Sept. 14, 2023).

[21] *Hunt v. Sec'y of Health & Human Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022); *Martin v. Sec'y of Health & Human Servs.*, No. 19-830V, 2021 WL 2350004 (Fed. Cl. Spec. Mstr. May 5, 2021); *Hall v. Sec'y of Health & Human Servs.*, No. 19-1556V, 2022 WL 2196412 (Fed. Cl. Spec. Mstr. May 6, 2022); and *Moore v. Sec'y of Health & Human Servs.*, No. 19-1850V, 2022 WL 962524 (Fed. Cl. Spec. Mstr. Feb. 25, 2022).

[22] Petitioner asserts that she had three cortisone injections. However, there is not preponderant evidence that the October 2020 cortisone injection, which was injected in her gluteal muscle, was intended as a treatment for her shoulder pain.

intervening factors may have contributed to Petitioner's condition).

Because Respondent did not update his position on damages after Petitioner underwent a second surgery and additional treatment, the cases Respondent cites involve petitioners whose injuries resolved sooner with less treatment, and are not useful comparisons. Petitioner's cases, by contrast, are generally helpful and supportive of her requested award.

Petitioner's injury and treatment course are closest to those in *M.W.* and *Meirndorf*, in which the petitioners were awarded $195,000.00 and $200,000.00 in pain and suffering, respectively. The *M.W.* and *Meirndorf* petitioners and Ms. Shiver had injuries continuing for just under four years (with the *Meirndorf* petitioner's injury duration being slightly shorter), and all three petitioners underwent two surgical procedures and similar amounts of PT. Ms. Shiver had two cortisone injections, while the *Meirndorf* petitioner had three, and the *M.W.* petitioner appears not to have had any. The *Meirndorf* petitioner's injury was, however, more severe, with initial "severe" and "constant" pain, and lingering symptoms at the conclusion of treatment. *Meirndorf*, 2022 WL 1055475, at *2.

I find that this case is most comparable to *M.W.*, and a similar pain and suffering award as that case is warranted. However, the record in this case reveals two lengthy treatment gaps (for most of 2022 and almost half of 2023), and throughout it appears Petitioner's course had improved, despite lingering issues. And imaging and other exams performed on Petitioner prior to her 2024 procedure revealed a number of likely-contributory comorbid conditions also impacting her shoulder, like osteoarthritis, that could not possibly be attributed to vaccination. It remains likely the initial SIRVA still played a role in her overall injury course, but these other factors, coupled with the delays, mandate against simply adopting *M.W.* as the result. Accordingly, I award the slightly-lesser sum of $190,000.00.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner's flu vaccine was administered in her left shoulder, that she suffered an injury that meets the definition for a Table SIRVA, and that she is entitled to compensation in this case. Furthermore, I find that $190,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $190,000.00, in the form of a check payable**

**to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[23]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.